# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

GERALD FREEMAN,

                   Plaintiff,

-vs-                                     Case No.  8:04-cv-2481-T-24TBM

FEDERAL EXPRESS CORPORATION and
DOES 1 though 10, inclusive,

                   Defendants.

_____/

## ORDER

This cause comes before the Court on Defendant Federal Express Corporation's

("FedEx") motion for summary judgment and motion to strike Plaintiff's affidavit (Doc. Nos. 29

and 42)[1].  Plaintiff filed responses in opposition to these motions (Doc. Nos. 40 and 43).

**I.**      **Background**

A.      Plaintiff and His Earlier Protected Activities

At all times relevant to this action, Plaintiff was employed as a courier by Defendant

FedEx at its station located at 1881 Main Street, Dunedin, Florida (hereinafter "CLW

station")(Doc. No. 2, ¶10 and Doc. No. 29, Freeman Depo., pp. 4-5).  Plaintiff first filed a charge

against Defendant FedEx alleging discrimination under the Age Discrimination in Employment

Act ("ADEA") with the Equal Employment Opportunity Commission ("EEOC") on July 8, 1996

---

[1]On December 10, 2004, the Court entered an Order in which it dismissed Plaintiff's
claims against DOES 1 through 10 in their individual capacities (Doc. No. 6).

(Doc. No. 29, Freeman Depo., p. 8 and Def. Exh. 14)[2]. That charge led to a federal lawsuit in which Plaintiff and five other couriers sued Defendant FedEx, <u>Freeman et al. v. Federal Express Corporation et al.</u>, Case No. 8:99-cv-2466-T-30TGW (Doc. No. 2, ¶11 and Doc. No. 29, Freeman Depo., pp. 10-11)[3]. The lawsuit was dismissed and the United States Court of Appeals for the Eleventh Circuit affirmed the order of dismissal on January 14, 2002. <u>See</u> <u>Freeman v. Fed. Express Corp.</u>, 31 Fed. Appx. 929 (11th Cir. 2002).

Subsequently, Plaintiff, along with several other couriers, was a plaintiff in a second federal lawsuit alleging age discrimination, <u>Bost et al. v. Federal Express Corporation</u>, Case No. 8:02-cv-837-T-17MSS (Doc. No. 29, Freeman Depo., p. 281 and Doc. No. 40)[4]. This second lawsuit was dismissed on February 18, 2003, and the United States Court of Appeals for the Eleventh Circuit affirmed the order of dismissal on June 8, 2004. <u>See</u> <u>Bost v. Federal Express Corp</u>, 372 F.3d 1233 (11th Cir. 2004), <u>cert. den</u>. 543 U.S. 1020 (2004).

B.      <u>Events of February 12, 2003</u>

Plaintiff's courier route ran from Clearwater Beach, Island Estates, to Sand Key, and for seven consecutive years he was the only full-time courier permanently assigned to this route (Doc. No. 29, Freeman Depo., p. 25). At the time relevant to this action, Plaintiff's route was called Route 280 (Doc. No. 29, Freeman Depo., p. 26 and Exh. 2).

On February 12, 2003, Plaintiff took his lunch break at 4:11 p.m., after he had finished his two-day business service deliveries, which have a 4:30 p.m. delivery deadline (Doc. No. 29,

_____

[2]Defendant FedEx filed numerous exhibits in support of its motion for summary judgment. However, the Court notes that the exhibits are not numbered sequentially.

[3]Filed October 26, 1999.

[4]Filed May 9, 2002.

Freeman Depo., pp. 33 and 36)[5].  Plaintiff states that after his lunch break, he was very fatigued but did not contact either a manager or a dispatcher to let them know (Doc. No. 29, Freeman Depo., pp. 38-39).  Near the end of his shift, Plaintiff was contacted by dispatch and requested to perform a bulk pick-up in his route area (Doc. No. 29, Exh. 2)[6].  Plaintiff contends that it was a "notice for a volunteer to pick-up a bulk on Sand Key via a broadcast message" (Doc. No. 29, Freeman Depo., pp. 43-44 and Doc. No. 40).  Defendant FedEx asserts that it has no record of such a broadcast message for "volunteers" (Doc. No. 29, ¶7).

Plaintiff alleges that he was too fatigued to make the pick-up safely, and, therefore, he declined to make the voluntary pick-up (Doc. No. 2, ¶12).  Specifically, Plaintiff states that he responded to the dispatcher that he still had 15 to 18 more deliveries to make and that, considering the number of hours that he would be on the clock, he didn't feel it was a safe thing for him to make the pickup (Doc. No. 29, Freeman Depo., p. 44).  Plaintiff claims that the fatigue section of Defendant FedEx's Safety Manual permits him to decline an assignment if he is tired (Doc. No. 29, Freeman Depo., pp. 167-168 and Doc. No. 40, Exh.1, Exh. E thereto, p. 28). Defendant FedEx admits that "fatigue can be a legitimate basis to talk to management about stopping work" (Doc. No. 3, ¶13).

In support of its motion for summary judgment, Defendant FedEx filed a transcript of the written messages that passed between the dispatcher and Plaintiff on February 12, 2003 (Doc.

---

[5]Plaintiff states that he rarely took his lunch before 3:00 p.m. (Doc. No. 29, Freeman Depo., p. 34).

[6]Couriers' vehicles are equipped with DADS units, which are mobile receivers that allow communication via typed messages (Doc. No. 29, Freeman Depo., p. 43).

No. 29, Exh. 2)[7].  At 5:20 p.m., the dispatcher sent the following message:

> CAN U GO GET A BULK ON THE BEACH FOR ME??? AT THE SHERATON
> ID

At 5:24 p.m., the dispatcher sent the following message to Plaintiff:

> GERAL WILL U PU THE BULK AT THE SHERATION FOR RT 180 . . . RYAN
> SHOWED UP AND THEY HAD A BULK WAITING FOR HIM   THEY USUALY
> CALL TO WARN US BUT TODAY THEY DIDNT???  CAN U HELP PLS ID

At 5:27 p.m., Plaintiff sent the following message to the dispatcher:

> DIS MSG 5 . . . NOT TONIGHT . . . I STIL HAVE OVER 12 DELIVERIES . . .
> HE IS ON HIS OWN . . . SORRY

At 5:36 p.m., the dispatcher sent the following message to Plaintiff:

> GERALD AFTER SPEAKING TO KEVIN HE IS ASKING THAT YOU PLEASE
> PU WHAT RYAN COULD NOT FIT IN HIS TRUCK TONIGHT PLS . . . RYAN
> LEFT BEHIND 25 PIECES 10-4 ID

At 5:37 p.m., Plaintiff sent to following message to the dispatcher:

> DIS I THINK YOU SHOULD CALL KEVIN AT THE STATION AND TELL
> HIM YOU HAVE 25 PKGS AT 1160 GULF THAT NEED PICKED UP CAUSE
> RT 280 CANT GET THEM TONIHGT . . . HE IS TOO TIRE AND IT WOULD
> NOT BE SAFE FOR HIM TO DO IT . . . SORRY

At 5:50 p.m., Plaintiff sent to following message to the dispatcher:

> DIS PLEASE REASSIGN DADS 2 . . . . YOU ASK IF I COULD HELP . . . I
> SAID NO ITS NOT SAFE FOR ME TO DO THE PICK UP TONIGHT . . . I
> WILL CALLED KEVIN MYSELF AS SOON AS I MAKE IT TO 880
> MANDALAY FOR MY LAST STOP . . . THEN HE WILL HAVE EVEN
> LESS OPTIONS AS IM NOT DOING IT

At 5:51, the dispatcher sent the following message to Plaintiff:

> 727-638-7074 IS HIS CELL NUMBER ID

---

[7]The Court notes that the messages contain many typographical and grammatical errors.

4

At 6:58 p.m., Plaintiff sent the following message to the dispatcher:

> DIS 10-19

At 7:09 p.m., Plaintiff sent the following message to the dispatcher:

> DIS TALKED TO KEVIN NIGHT MGR. . . TOLD HIM I DIDN'T FEEL IT
> WAS SAFE FOR ME TO LIFT 750 LBS. . . 25 BOXES AFTER WORKING
> ALL DAY . . . I SAID I INFORMED YOU I DIDN'T VOLUNTEER FOR THIS
> PU BECAUSE OF THE SAFETY ISSUE AND YOU SHOLD CALLED HIM
> AND WORK OUT AN ALTERNA

At 7:11 p.m., Plaintiff sent the following message to this dispatcher:

> DIS HE TOLD ME TO COME IN AND DISCUSS THIS WITH HIM SO THAT
> IS WHAT I AM DOING . . . I AM 10.51 TO THE CLW STATION PER THE PM
> MGRS REQUEST . . .

On February 12, 2003, Kevin Hart ("Hart") was the manager in charge of afternoon pick-ups (Doc. No. 29, Hart Aff., ¶2). Hart later became Plaintiff's immediate supervisor on or about May 2003 (Doc. No. 29, Hart Aff., ¶3). Plaintiff telephoned Hart with respect to the requested bulk pick-up in his route area after Plaintiff had completed his last delivery (Doc. No. 40, Exh. 1, Exh. A thereto, ¶8). Plaintiff states that during their phone conversation, Hart "told me that there was a bunch of packages at the hotel and that they needed to be picked up" (Doc. No. 29, Freeman Depo., p. 58). Plaintiff further states he advised Hart, as he had advised the dispatcher, that with everything he'd done that day making the pick-up would be an unsafe act and he was "declining to do so" (Doc. No. 29, Freeman Depo., pp. 58-59). Plaintiff claims that Hart reiterated that Plaintiff needed to make that pickup and told him "that operational needs requires me to make that pickup" (Doc. No. 29, Freeman Depo., p. 59). Plaintiff alleges that during their telephone conversation, Hart told him that "I feel like you're playing the age card" (Doc. No. 29, Freeman Depo., pp. 61-63).

5

When Plaintiff returned to the CLW station, he met with Hart for 15 to 20 minutes (Doc. No. 29, Freeman Depo., p. 71). Plaintiff states that during this meeting with Hart, he told Hart "with my age and experience on the route, I felt that it would be a -- a unsafe act to try and attempt" (Doc. No. 29, Freeman Depo., p. 63). Plaintiff alleges that Hart replied, "[y]ou would be the last one that I would expect to use [age]" (Doc. No. 29, Freeman Depo., p. 64). Plaintiff contends that Hart was referring to his previous lawsuit but admits he "read between the lines" and was not aware of whether or not Hart had any knowledge about the EEOC charge or the previous lawsuits (Doc. No. 29, Freeman Depo., pp. 64-66). Plaintiff alleges in his complaint that Hart, and other members of Defendant FedEx management, "are aware of his involvement in the federal litigation alleging unlawful age discrimination" (Doc. No. 2, ¶¶31 and 37).

During their meeting, Hart reiterated that he needed Plaintiff to make the pick-up based on operational needs (Doc. No. 29, Freeman Depo., p. 72). However, Hart did not require Plaintiff to go back out and perform the requested bulk pick-up (Doc. No. 29, Freeman Depo., p. 72). Instead, Hart advised Plaintiff that he wanted him to submit a written statement about why he declined to perform the pickup (Doc. No. 29, Freeman Depo., p. 72). Plaintiff claims he was unable to do so and told Hart "I was too upset to even do it, that I needed time to collect my thoughts . . . I needed to refresh my brain" (Doc. No. 29, Freeman Depo., p. 72-73). Hart then made an online counseling ("OLCC") entry that stated:

> GERALD WILL PROVIDE CLW MANAGEMENT WITH A WRITTEN STATEMENT
> ON 2/13/03 IN REGARDS TO NOT PERFORMING A PICK UP ON 2/12/03 WHEN ASKED TO BY MANAGEMENT.  GERALD WAS ALSO ASKED TO WRITE THIS STATEMENT WHEN HE GOT IN AND HE REFUSED TO DO SO DUE TO NEEDED MORE TIME TO GATHER HIS THOUGHTS.
> KEVIN

(Doc. No. 29, Freeman Depo., pp. 73 and 228-29 and Def. Exh. 3).  Hart avers "I created the online counseling because Mr. Freeman requested that he be able to write his statement regarding this incident while at home instead of at the time of our conversation . . . [a]lso, I needed to communicate the incident to his immediate manager at that time" (Doc. No. 29, Hart Aff., ¶ 11).  Plaintiff submitted a written statement the next day, February 13, 2003 (Doc. No. 29, Freeman Depo., pp. 77, 79-80, Def. Exh. 4 and Doc. No. 40).  Defendant claims that when other employees of Defendant FedEx have declined an extra work assignment they did not have to provide a written statement (Doc. No. 40, Exh. 1, Exh. C and F thereto).  However, Plaintiff concedes that he does not know of any other courier that was on an extended route where no one else was available to perform a late bulk pick-up who refused to perform the pick-up (Doc. No. 29, Freeman Depo., p. 99).

Plaintiff believes that the OLCC entry could be interpreted as a form of discipline since it is a part of his permanent record and others are able to review the OLCC entry (Doc. No. 29, Freeman Depo., pp. 75-76).  However, Plaintiff admits that the OLCC entry did not "specifically" state anything about the possibility of being terminated and that he was never given a warning letter or performance reminder for failing to perform the bulk pick-up (Doc. No. 29, Freeman Depo., p. 21).  Importantly, Plaintiff admits that the OLCC entry did not affect his pay or benefits or job duties (Doc. No. 29, Freeman Depo., p. 76).

C.      March 2003 Performance Review

Plaintiff alleges that the missed bulk pick-up was initially on his March 2003 performance review, but Mickie Harrison, Plaintiff's manager, deleted the reference, and he received a good performance review,  6.9 on a 7.0 scale (Doc. No. 29, Freeman Depo., pp. 94-96

and Doc. No. 40, Exh. 2).

D.    Change in Plaintiff's Start Time

Plaintiff's complaint contains the broad allegation that "[F]rom the outset and particularly in January 2004, FedEx management restructured plaintiff's work schedule and his route so that he lost one-half of his afternoon work and his early start time" (Doc. No. 2, ¶23). Plaintiff contends that he began receiving "a barrage of bulk pick-ups, some of which were suddenly cancelled after I agreed to do the assignment" (Doc. No. 40, p. 5).   Plaintiff states that after February 12, 2003, Defendant FedEx changed his start time by 25 minutes (Doc. No. 29, Exh. 18), and in February 2004, changed his start time by 50 minutes or more (Doc. No. 29, Exh. 18).   However, Plaintiff admits that he made up that time on the end of his shift and that he had more overtime hours in 2003 than in many years (Doc. No. 29, Freeman Depo., pp. 194 and 287).   Plaintiff alleges that he was damaged by his start time being changed "because the work that occurs in the first hour of the day is a lot easier to complete than the work that I'm doing in the last hour of the day" (Doc. No. 29, Freeman Depo., p. 288).

E.    Shift Schedule Change

In April or May 2003, Plaintiff's route was switched from a 5/8 schedule (5 days a week for 8 hours each day) to a 4/10 schedule (4 days a week for 10 hours each day)(Doc. No. 2, ¶20, Doc. No. 29, Freeman Depo., pp. 104-105). Plaintiff felt the 4/10 schedule was "revenge" for his refusal to perform the bulk pick-up (Doc. No. 29, Freeman Depo., p. 112) and that while on the 4/10 schedule, he actually worked 12 to 13 hours a day (Doc. No.  2, ¶20).   Defendant FedEx asserts that "station management decided to try this shift to cut down on the stem time (the time each courier is paid for traveling to and from this [sic] delivery area)" (Doc. No. 29, ¶48, Hart

Aff., ¶¶6-9).  Plaintiff's route was one of five routes in Pinellas and Pasco counties changed to a

4/10 schedule (Doc. No. 29, Freeman Depo, p. 105 and Hart Aff., ¶8). Plaintiff had the

opportunity to post or bid for another route with a 5/8 schedule, but decided to take the 4/10

schedule on his current route because he "didn't feel that it would last" (Doc. No. 29, Freeman

Depo., p. 114).  Plaintiff only worked the 4/10 schedule on his route for three weeks before it

was switched back to a 5/8 schedule (Doc. No. 29, Freeman Depo., pp. 109 and 131).

     F.     <u>October 28, 2003 Letter and October 31, 2003 Meeting</u>

     On March 15, 2003, Plaintiff filed an EEOC charge with respect to the events of

February 12, 2003. On October 28, 2003, Defendant FedEx sent a letter to Plaintiff's co-workers

advising them of the EEOC's investigation into Plaintiff's charges and advising them that "[a]s

regulated by federal law, FedEx has provided your home address and telephone number to the

agency" (Doc. No. 40, Exh. 1, Exh. J thereto, Clausnitzer Aff., ¶6 and Exh. 1 thereto) and that

there was "no obligation to contact the Agency and FedEx cannot compel" participation.

Plaintiff contends that these letters were "a character-assassination designed to intimidate and

undermine" the EEOC's investigation (Doc. No. 40, Exh. 1, Exh. L thereto).  On October 31,

2003, Plaintiff met with Hart and manager Chris Savas ("Savas") "who tried to pressure him into

admitting fault regarding the February 12, 2003 incident" (Doc. No. 2, ¶22).   Ronald

Clausnitzer, another courier, was also present at the meeting (Doc. No. 40, Exh. 1, Exh. J

thereto, Clausnitzer Aff., ¶7).  Defendant FedEx contends that the purpose of the meeting to

"clarify whether Freeman still wanted to be on the no-call list if freight was late" (Doc. No. 29,

¶66 and Doc. No. 40, Exh.1, Exh. L thereto)[8], and during the course of the meeting, Hart

_____

     [8]The Court notes that Defendant FedEx references portions of Plaintiff's deposition in
support of this fact.  However, Defendant FedEx failed to file this portion of the transcript in the

inquired of Plaintiff why he did not respond to Hart's morning greetings.  In response, Plaintiff

brought up the events of February 12, 2003, and indicated that the reason Plaintiff was not

returning Hart's greetings was that Hart had put a letter in Plaintiff's file (Doc. No. 29, Freeman

Depo., p. 168 and Doc. No. 40, Exh.1, Exh. L thereto).  Hart denies ever putting a letter in

Plaintiff's file (Doc. No. 40, Exh. 1, Exh. L thereto).  Plaintiff admits that the alleged letter has

not been part of any disciplinary action against him (Doc. No. 29, Freeman Depo., p. 171).

> G.    Plaintiff's Actions

On June 1, 2003, Plaintiff alleges he filed a charge of retaliation with the Florida

Commission on Human Rights (Doc. No. 2, ¶25)[9].  On February 5, 2004, Plaintiff received a

letter of determination from the Tampa Office of the EEOC ("the Determination")[10].  On or

about April 2, 2004, Plaintiff alleges he received notice of his right to sue (Doc. No. 2, ¶26)[11].

On June 29, 2004, Plaintiff filed a complaint in the Circuit Court of the Sixth Judicial

Circuit, in and for Pinellas County (Doc. No. 2).  In the complaint, Plaintiff asserts claims for

retaliation, in violation of the Age Discrimination and Employment Act, 29 U.S.C. §621 *et seq.*

---

record.

[9]In reviewing the pleadings, the Court notes that Plaintiff appears to have filed his EEOC charge on March 15, 2003 (Doc. No. 29, Def. Exh. 18 and Doc. No. 40, Exh.1, Exh. H thereto). The March 15, 2003, EEOC charge pertains solely to the time period of February 12, 2003 - February 20, 2003.  Subsequently, on November 6, 2003, Plaintiff filed an "Addendum to Retaliation Charge Case #151-2003-01191" (Doc. No. 40, Exh.1, Exh. L thereto).  The November 6, 2003, addendum pertains to the October 31, 2003, meeting between Plaintiff, Hart, Savas and Clausnitzer and correspondence Defendant FedEx sent to CLW station workers in regard to the EEOC investigation.

[10]Charge # 151 2003 01191.

[11]The Court notes that while the complaint references Plaintiff receiving notice of his right to sue from the EEOC, Plaintiff has not made this document of record in the case.

("ADEA")(Count II) and the Florida Civil Rights Act of 1992, Fla. Stat. §760.01 *et seq*.

("FCRA")(Count I).  On November 15, 2004, Defendant FedEx filed a timely Notice of

Removal, pursuant to 28 U.S.C. §1441, alleging federal question jurisdiction based upon

Plaintiff's ADEA claim (Doc. No. 1).

### II.      Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories and admissions on file, together with the affidavits, if any, show that the moving

party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears

the initial burden of showing the Court, by reference to materials on file, that there are no

genuine issues of material fact that should be decided at trial.  See Celotex Corp. v. Catrett, 477

U.S. 317 (1986).  A moving party discharges its burden on a motion for summary judgment by

"showing" or "pointing out" to the Court that there is an absence of evidence to support the non-

moving party's case.  Id. at 325.  Rule 56 permits the moving party to discharge its burden with

or without supporting affidavits and to move for summary judgment on the case as a whole or on

any claim.  See id.  When a moving party has discharged its burden, the non-moving party must

then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to

interrogatories, and admissions on file," designate specific facts showing there is a genuine issue

for trial.  Id. at 324.

In determining whether the moving party has met its burden of establishing that there is

no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the

Court must draw inferences from the evidence in the light most favorable to the non-movant and

resolve all reasonable doubts in that party's favor.  See Spence v. Zimmerman, 873 F.2d 256

(11th Cir. 1989); see also Samples on behalf of Samples v. City of Atlanta, 846 F.2d 1328, 1330

(11th Cir. 1988).  The Eleventh Circuit has explained the reasonableness standard:

> In deciding whether an inference is reasonable, the Court must "cull the universe
> of possible inferences from the facts established by weighing each against the
> abstract standard of reasonableness."  [citation omitted].  The opposing party's
> inferences need not be more probable than those inferences in favor of the movant
> to create a factual dispute, so long as they reasonably may be drawn from the
> facts.  When more than one inference reasonably can be drawn, it is for the trier
> of fact to determine the proper one.

WSB-TV v. Lee, 842 F.2d 1266, 1270 (11th Cir. 1988).

Thus, if a reasonable fact finder evaluating the evidence could draw more than one

inference from the facts, and if that inference introduces a genuine issue of material fact, then the

court should not grant the summary judgment motion.  See Augusta Iron & Steel Works v.

Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988).  A dispute about a material fact

is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-

moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The inquiry is

"whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.

## III.   Discussion

In order to establish a prima facie case of retaliation under the ADEA, a plaintiff must

show that: (1) he was engaged in a protected activity; (2) he suffered an adverse employment

action; and (3) there was a causal link between his protected activity and the adverse

employment action[12].  See Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002).

---

[12]Furthermore, the FCRA is "closely patterned after its federal equivalent;" as such, the
Court examines Plaintiff's claim of retaliation under the FCRA in the same manner as it would
evaluate Plaintiff's claim under the ADEA.  See Malewski v. NationsBank of Florida, N.A., 978
F. Supp. 1095, 1105 (S.D. Fla. 1997); see also Bogle v. Orange County Bd. of County

"If 'a plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant' to produce 'legitimate reasons for the adverse employment action'" Shannon v. Bellsouth Telecomm., Inc., 292 F.3d 712, 715 (11th Cir. 2002)(quoting Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000)).  Once the defendant does so, the plaintiff must show that the proffered reasons the defendant gave were pretextual.  Id.

Defendant FedEx asserts that it is entitled to summary judgment on Plaintiff's retaliation claims. Defendant FedEx does not contest that Plaintiff engaged in statutorily protected activities.  However, Defendant FedEx argues that Plaintiff did not suffer any adverse employment action.  Furthermore, Defendant FedEx argues that if there was an adverse employment action,  there is no casual link between Plaintiff's earlier protected activities and the alleged adverse employment action.  Lastly, Defendant FedEx argues that Plaintiff cannot establish that Defendant FedEx's proffered reasons for its employment actions were pretextual. The Court agrees that Plaintiff has failed to establish a prima facie case of retaliation and that summary judgment in Defendant FedEx's favor is appropriate.

A.     Adverse Employment Action

"An employment action . . . is not adverse merely because the employee dislikes it or disagrees with it."  Perryman v. West, 949 F. Supp. 815, 819 (M.D. Ala. 1996).  The action must either be an ultimate employment decision, such as discharge, failure to hire or demotion, or else must meet some threshold level of substantiality to give rise to a legally cognizable claim.  See

_____

Commissioners, 162 F.3d 653, 659 (11th Cir. 1998)(finding that the Court's conclusion on the plaintiff's ADEA claim precluded any need to address the plaintiff's remaining state law claims of age discrimination under the FCRA); Florida Dep't of Com. Affairs v. Bryant, 586 So.2d 1205, 1209 (Fla. 1st DCA 1991)(noting that since the FCRA was modeled after its federal counterpart, federal case law analyzing discrimination claims applied).

Stavropoulos v. Firestone, 361 F.3d 610, 616-17 (11th Cir. 2004)(citing Wideman v. Wal-Mart

Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998)), cert. denied, 125 S. Ct. 1850 (2005).  If the

action is not an ultimate employment decision, then the employment action must be "objectively

serious and tangible enough" to alter an employee's compensation or otherwise effect their status

as an employee.  See Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 588 (11th Cir. 2000).  "The

asserted impact cannot be speculative and must at least have a tangible adverse effect on

plaintiff's employment."  Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir.

2001).

### 1.    Plaintiff's Alleged Adverse Employment Actions

Plaintiff's pleadings are not a model of clarity with respect to which conduct by

Defendant FedEx Plaintiff is contending constitutes adverse employment actions.  First, Plaintiff

alleges that he was disciplined by the OLCC entry on February 12, 2003 and at the October 31,

2003, meeting for refusing to perform the requested bulk pick-up on February 12, 2003 (Doc.

No. 2, ¶¶15, 19 and 22).  Second, he alleges that in April or May 2003, his route was switched

from a 5/8 schedule to a 4/10 schedule (Doc. No. 2, ¶20).  Third, he alleges that Defendant

FedEx restructured his work schedule and his route so that "he lost one-half of his afternoon

work and his early start time" (Doc. No. 2, ¶23).  Fourth, Plaintiff alleges that in March 2004, he

was "targeted" because "he could not do the assigned station goal of 10½ stops per hour"and that

he has "received further disciplinary steps which could lead to termination" and "his worst

performance review ever" (Doc. No. 2, ¶24).

A plaintiff cannot raise a claim in court that he did not raise in his EEOC charge unless that

claim is like or related to the charge's allegations, limited only by the scope of the EEOC

14

investigation that could reasonably be expected to develop out of the initial charges asserted.

See Chanda v. Engelhard/ICC, 234 F.3d 1219, 1225 (11th Cir. 2000). The two charge documents Plaintiff filed with the EEOC do not refer to any alleged occasions of conduct outside of the time frame of February 12, 2003 to October 31, 2003[13].  In fact, the March 15, 2003, EEOC charge pertains solely to the time period of February 12, 2003 - February 20, 2003 (Doc. No. 29, Def. Exh. 18 and Doc. No. 40, Exh.1, Exh. H thereto).  Plaintiff's November 6, 2003, "Addendum to Retaliation Charge Case #151-2003-01191" pertains solely to the October 31, 2003, meeting between Plaintiff, Hart, Savas and Clausnitzer and correspondence Defendant FedEx sent to CLW station workers in regard to the EEOC investigation (Doc. No. 40, Exh.1, Exh. L thereto). Importantly, the February 5, 2004, EEOC determination only addresses the alleged discipline of Plaintiff for not performing the bulk pick-up on February 12, 2003, and the 4/10 schedule shift change (Doc. No. 40, Exh. 14, pp. 1 - 2).

Therefore, to the extent that Plaintiff has raised any retaliation claims based upon events that were not raised his March 15, 2003, and November 6, 2003, EEOC charges, Plaintiff cannot litigate these claims because he failed to exhaust these claims with the EEOC.  See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 111-13 (2002).  Plaintiff's contention that Defendant FedEx restructured his work schedule by changing his start time and/or that he was assigned too much or too little freight are outside the scope of Plaintiff's EEOC charges, have not been

---

[13]The Court notes that Plaintiff apparently also filed an EEOC charge on October 22, 2003, Charge #151-2004-00188, with respect to Defendant FedEx's alleged deterrence of Plaintiff, and other couriers, from attending mediation proceedings with respect to their appeal in Bost et al. v. Federal Express Corporation, Case No. 8:02-cv-837-T-17MSS (Doc. No. 40, Exh. 5).  The allegations contained in the October 22, 2003, EEOC charge are not a part of Plaintiff's complaint in this lawsuit.  Because Plaintiff failed to properly plead these facts in his complaint, he cannot now attempt to use this alleged incident to support his retaliation claims.  See Klauber v. City of Sarasota, 235 F. Supp. 2d 1263, 1268-69 (M.D. Fla. 2002).

exhausted and therefore cannot be raised in this action.

### 2.       The On Line Counseling Entry

The OLCC entry is simply not significant enough to be considered discipline and does

not constitute an adverse employment action.  See Graham v. State Farm Mutual Ins. Co., 193

F.3d 1274, 1283 (11th Cir. 1999)(a counseling memo expressing concern with plaintiff's

improper absences and warning of possible ramifications did not meet the threshold level of

substantiality); see also Davis, 245 F.3d at 1241.  The OLCC entry merely reflects that on the

following day Plaintiff was to turn in a written statement with respect to not performing the bulk

pick-upon February 12, 2003.

There is no evidence before the court that the February 12, 2003 OLCC entry constituted

discipline under Defendant FedEx's discipline structure.  Furthermore, there is no evidence that

the OLCC entry resulted in any negative consequences to Plaintiff such as loss of pay or benefits

or had any impact whatsoever on the terms and conditions of his employment.  In fact, in March

2003, Plaintiff received a good performance review, a 6.9 on a 7.0 scale.  Accordingly, the Court

finds that the OLCC entry is not an adverse employment action that would support a prima facie

case of retaliation.

### 3.       The Shift Change From 5/8 Schedule to a 4/10 Schedule

The shift change from a 5/8 schedule to a 4/10 schedule does not constitute an adverse

employment action.  See Gupta, 212 F.3d at 587-89 (finding that university's refusal to give a

professor a desired work assignment, at desired hours and locations did not constitute an adverse

employment action).  Plaintiff did not lose pay, position, or benefits due to this schedule change.

Rather, he continued to work at the CLW station, in the same position, with the same job

responsibilities and same pay.  Plaintiff had the opportunity to bid for a route with a 5/8 schedule

but did not do so.  Additionally, the shift change from a 5/8 schedule to a 4/10 schedule only

lasted approximately three weeks.  Accordingly, the Court finds that the shift change from a 5/8

schedule to a 4/10 schedule did not constitute discipline and is not a serious or tangible enough

employment action to support a prima facie case of retaliation.

4.      Plaintiff's Claims Considered Collectively

Finally the Court finds that the actions alleged by Plaintiff to be adverse, even when

considered collectively, are not ultimate employment decisions nor are they substantial enough

to give rise to a claim because they had no tangible averse effect on the terms and conditions of

Plaintiff's employment.

B.      Casual Connection Between Protected Activities and Alleged Adverse Actions

Even if Plaintiff had established that any of the above actions constituted an adverse

employment action, he has failed to establish that any adverse action was casually connected to

his protected activities.  "To establish a causal connection, a plaintiff must show that the

decision-makers were aware of the protected conduct, and that the protected activity and the

adverse actions were not wholly unrelated."  Shannon, 292 F.3d at 716 (citing Gupta, 212 F.3d

571 at 590); see also Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1354 (11th Cir. 1999).

"Close temporal proximity between the protected activity and the adverse action may be

sufficient to show that the two were not wholly unrelated."  Shannon, 292 F.3d at 716-17 (citing

Bass v. Bd. of County Comm'rs., 256 F.3d 1095, 1119 (11th Cir. 2001)).  In order to prove

causation by temporal proximity, the temporal proximity must be "very close."  See Higdon v.

Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004).  "If there is a substantial delay between the

17

protected expression and the adverse action, in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." Id.

As to the alleged acts committed by Hart, there is no evidence before the Court that Hart was aware of Plaintiff's previous protected activities[14]. Additionally, there is no temporal proximity between the 1996 EEOC charge and the two subsequent federal lawsuits, filed October 26, 1999, and May 9, 2002, and February 12, 2003, and the OLCC entry and the May 2003 shift change to support Plaintiff's retaliation claims. Plaintiff contends that there is temporal proximity because his federal cases were on appeal. However, Plaintiff's argument not only presupposes that Hart was aware of the litigation, but that he was aware of its then current status. Accordingly, the Court finds that Plaintiff has failed to establish a casual connection between Plaintiff's protected activities and the alleged adverse employment actions that would support a prima facie case of retaliation.

C.    Pretext

Even assuming that Plaintiff could establish a prima facie case of retaliation, he has not shown that Defendant FedEx's proffered non-discriminatory reasons for each action are pretextual. Pretext means more than an inconsistency or mistake, pretext is "a lie, specifically a phony reason for some action." Silvera v. Orange County School Bd, 244 F.3d, 1253 1261 (11th Cir. 2001). A plaintiff cannot establish pretext by merely questioning the wisdom of the employer's reasoning, especially where "the reason is one that might motivate a reasonable employer." See Lee v. GTE Florida, Inc., 226 F.3d 1249, 1255 (11th Cir. 2000)(quoting Wolf v.

---

[14]The only evidence put forth by Plaintiff that Hart was aware of Plaintiff's protected activities is Plaintiff's conjecture that Hart "obviously knew of my previous ADEA problems" based upon Hart's alleged "age card" comments (Doc. No. 40).

<u>Buss (America) Inc.</u>, 77 F.3d 914, 919 (7th Cir. 1996)).  Finally, courts cannot reexamine an employer's business decisions; the court's inquiry is limited to determining whether the employer gave an honest explanation for its behavior.  <u>See</u> <u>Elrod v. Sears, Roebuck & Co.</u>, 939 F.2d 1466, 1470 (11th Cir. 1991).

 In response to the motion for summary judgment, Plaintiff has presented no evidence from which a jury could infer that FedEx's articulated reasons for the entry of the OLCC and temporary implementation of a 4/10 schedule were pretext for retaliation.  <u>See</u> <u>Sullivan v. National R.R. Passenger Corp.</u>, 170 F.3d 1056, 1061 (11th Cir. 1999).   Plaintiff's only evidence of pretext is his own subjective belief that Hart's alleged "age card" comment demonstrates Defendant FedEx's retaliatory motives.  However, conclusory allegations are not sufficient to raise an inference of pretext.  <u>See</u> <u>Grigsby v. Reynold Metals Co.</u>, 821 F.2d 590, 597 (11th Cir. 1987).  Defendant FedEx has articulated sufficient legitimate reasons for its actions.  Namely, that the OLCC entry was entered as a reminder to ensure that Plaintiff's manager was aware that Plaintiff was preparing his written statement with respect to the requested bulk pick-up at home and that the shift change was implemented in an effort to cut down on couriers' stem times. This type of temporary change in work assignment should not be second guessed as "[w]ork assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities." <u>Davis</u>, 245 F. 3d at 1245 .

 Accordingly, summary judgment in Defendant FedEx's favor is appropriate.

**IV.** <u>**Conclusion**</u>

 Accordingly, it is **ORDERED AND ADJUDGED** that:

(1)      Defendant FedEx's motion for summary judgment (Doc. No. 29) is **GRANTED**.

(2)      The Clerk is directed to enter judgment in favor of Defendant FedEx and to

         **CLOSE** this case.

(3)      The Pretrial Conference in the above-captioned matter scheduled for

         Friday, March 10, 2006 at 8:30 a.m. is hereby cancelled.

(4)      Defendant FedEx's motion to strike (Doc. No. 42) is **DENIED AS MOOT**.  With

         respect to the exhibits attached to the Affidavit II of Gerald Freeman classified by

         Plaintiff as "My Diary" records, the Court did not consider Plaintiff's handwritten

         notes in rendering its decision on Defendant FedEx's motion for summary

         judgment.

**DONE AND ORDERED** at Tampa, Florida this 8th day of March, 2006.

SUSAN C. BUCKLEW
United States District Judge

Copies to:

Counsel of Record

20